#### IN THE UNITED STATES DISTRICT COURT FOR THE
#### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ANGELA L. LIGGINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15-CV-234-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

#### OPINION AND ORDER

Plaintiff, Angela L. Liggins, seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner" and "SSA") denying Liggins' applications for disability insurance benefits and for supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed below, the Commissioner's decision is **AFFIRMED**.

#### Procedural History

Liggins filed her applications for disability insurance benefits and supplemental security income benefits with a protective filing date of June 20, 2011. [R. 14, R. 273]. She originally alleged onset of disability as of October 5, 2007. [R. 251, 253]. Liggins claimed she was disabled due to multiple sclerosis, a slipped disc at L4 and L5, numbness in her left hand headaches and tingling in both legs. [R. 277].

The applications were denied initially and on reconsideration. [R. 151, 162]. An administrative hearing was held before Administrative Law Judge ("ALJ") John W. Belcher on November 7, 2012. [R.29-52]. At the hearing, the onset date was amended to June 20, 2010,

and her attorney asked the ALJ to consider a listing for multiple sclerosis. [R. 45-46, R. 104]. The ALJ announced that he needed further development of the record with respect to this issue, and adjourned the hearing. [R. 52-53].

At the request of the ALJ, a consultative neurological examination was performed on Liggins January 11, 2013, by Shashi Husain, M.D. A second hearing was held on July 2, 2013. [R. 54-139]. Ronald Devere, M.D., an impartial medical expert, testified by telephone during the hearing. [R. 59-79]. By decision dated October 24, 2013, the ALJ ruled that Liggins had not been under a disability from October 25, 2007, through the date of the decision. [R. 24].

The Appeals Council affirmed the denial on February 28, 2015. [R. 1-3]. Liggins timely sought review by this court.

**Claimant's Background**

Liggins was born September 1, 1966, and was 47 years old at the time of the ALJ's decision. [R. 469]. She has a twelfth grade education, graduated with a diploma, and completed one year of college at a vocational school. [R. 36-37].

In an Adult Function Report completed August 3, 2011, Liggins reported she prepares meals daily, does laundry, washes dishes and cleans her room. [R. 286 (Ex. 3E)]. She drives a car, shops every two weeks for household goods, shoes and personal needs and once a month for food. [R. 287]. She listens to music, watches television and reads every day; she exercises three times a week. [R. 288]. She talks on the phone daily, and visits relatives and goes to church on a regular basis. *Id.* She can no longer go to night clubs, walk distances or ride a bike. *Id.* She doesn't go out into public too often and doesn't dance because she is afraid her legs will give out. [R. 289]. She has trouble with squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, using hands and getting along with others. *Id.* She can walk a block

before needing to stop and rest, and can resume walking after about two minutes rest. *Id.* She is able to follow written and spoken instructions, gets along well with authority figures, and has never been fired or laid off because of problems getting along with other people. [R. 290]. She handles stress poorly, handles changes in routine fair, and is easily irritated when she is stressed. *Id.*

At the hearings, Liggins testified that she lives with her mother in a house in Tulsa. [R. 34-35]. She takes over the counter Motrin, Advil and Aleve, and prescription Lortab, 10. [R. 44-45]. She also takes Tiazac for Raynaud's disorder. [R. 94]. She testified she would be able to use her fingers for typing for about 30 minutes at a time before she would need to stop and give them a break. [R. 95-96]. Cold weather makes the problem worse. [R. 98]. She takes about three naps a day because she is tired and fatigued. [R. 99-100]. Since she was in a car wreck on June 20, 2010, her lower back and legs have bothered her. [R.100]. She has tingling in her hands and legs, and experiences sharp pain in her lower back. [R. 100, R. 102].

On a good day, she can only sit thirty to forty minutes before she gets stiff and has to stand up. [R. 104]. On a bad day, she can only sit ten to fifteen minutes. [R. 115]. She can walk the length of two blocks. [R. 115-116]. When she walks, she stumbles if she turns a certain way. [R. 104]. Three to four days a week her symptoms are more severe. [R. 104-105]. On those days she just lies around and doesn't leave the house. [R. 105]. She does not get a full night's sleep because her right hip gives her problems. *Id.* She can lift less than ten pounds because her hands give out. [R. 114]. She has headaches three to four times a day. [R. 116]. If she takes a Lortab, the headache lasts about an hour, but it eventually comes back. [R. 116].

Liggins gets dizzy and can't run. *Id.* She cannot get on the floor and crawl because she can't bend down and get back up without holding onto something, due to her legs and back. [R.

3

121-122]. She can't concentrate. [R. 122]. Her hair has fallen out. *Id.* She was doing great until the car wreck. *Id.* She usually has other people drive her because she isn't comfortable driving anymore. [R. 118]. After the car wreck, she hired a lawyer, who submitted a claim to the insurance company, but the insurance company went bankrupt. [R. 119-121].

Liggins has previous work experience in customer service, sedentary, SVP 4. [R. 127].

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[1]  *See also Wall v. Astrue*, 561 F.3d 1048, 1052 (10th

---

[1] Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004).

"Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Wall*, 561 F.3d at 1052 (quotation and citation omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Liggins met insured status requirements through December 31, 2012, and, at Step One, that she had not engaged in any substantial gainful activity since her alleged onset date of October 25, 2007. [R. 16]. He found at Step Two that Liggins had the severe impairment of degenerative disc disease lumbar spine non-symptomatic. *Id.* Additionally, he found Liggins' light neuropathy (sub-clinical) was non-severe. *Id.* He found a lack of objective evidence to substantiate that claimant's alleged symptoms of multiple sclerosis, hand numbness, leg tingling, headaches and polymyositis were medically determinable impairments. [R. 17]. At Step Three, he found that claimant did not have an impairment or combination of impairments that meets or medically equals the severity of any listing. *Id.* He found that Liggins had the RFC to perform sedentary work with the following limitations:

claimant can lift and/or carry ten pounds occasionally and less than ten pounds frequently; stand and/or walk two hours in an eight-hour workday and sit six hours in an eight-hour workday all with normal breaks; she should avoid climbing ropes, ladders and scaffolds; she can occasionally climb stairs, balance, bend or stoop, kneel crouch and crawl; she should avoid hazardous or fast machinery, unprotected heights and driving. *Id.*

At Step Four, the ALJ determined that Liggins was capable of performing past relevant work as a Customer Service Representative. [R. 24]. The ALJ concluded that Liggins had not been disabled from October 25, 2007, through the date of his decision. *Id*.

## Review

On appeal, Liggins argues the ALJ improperly gave more weight to the opinion of testifying expert Ronald Devere, M.D., and the findings of consultative neurologist Shasi Husain, M.D., than to the opinions of her treating physician, David Traub, M.D.[2]

## Analysis

Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014). "When assessing a medical opinion, the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c)(2) and give good reasons for the weight he assigns to the opinion." *Vigil v. Colvin*, 805 F.3d 1199, 1202 (10th Cir. 2015) (citations omitted). When an RFC conflicts with an opinion from a medical source, the ALJ must explain

---

[2] Dr. Traub diagnosed Liggins as definitively suffering from multiple sclerosis and also prepared a Medical Source Statement ("MSS") imposing limitations based on the MS diagnosis and on his assessment of her low back pain.

6

why the opinion was not adopted. SSR 96-8P (S.S.A.), 1996 WL 374184 at *7. However, ultimately the ALJ—not a physician—is charged with determining a claimant's RFC from the medical record. *See Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004) (citing 20 C.F.R. § 416.927(e)(2); SSR 96-5p, 1996 WL 374183, at *5).

Liggins contends that Dr. Traub's multiple sclerosis diagnosis and MSS are supported by her brain MRI and abnormal spinal fluid; his clinical findings that she had dizziness/vertigo, weakness, parathesia in her legs; and medical records of treating physicians Gerald Snider, M.D., and Kris Parchuri, D.O. Dkt. #15 at 6. Similarly, she argues that Dr. Traub's assessment of her low back impairment is supported by the spinal MRI, x-rays and EMG findings; his clinical findings; and medical records of other treating physicians. *Id.*

The ALJ gave "very little credence" to Dr. Traub's opinions and "great weight" to the opinions of Drs. Devere, Husain and Fielding, "as their findings and/or opinions are consistent with the totality of medical evidence." [R. 22, 24]. He thoroughly discussed the medical evidence, and supported his assignment of weight by citing to the medical record, as follows:

- On May 3, 2011, when claimant first presented to Dr. Traub, the doctor stated, "The neurological exam was impressive for very brisk reflexes in the bilateral patella and right biceps but the left biceps was attenuated. She had down-going plantar reflex with no Babinski sign. She had weakness with extensor hallices longus extension in the left foot and other [than] that this and the reflexes the neurological exam was without gross abnormalities. There was no swelling in the feet and no discoloration and no moisture and the temperature was appropriate." [R. 19, R. 401].

- On May 9, 2011, MRI of the thoracic spine was normal; there was significant multilevel C-spine pathology, not fully imaged on this examination. On the same date, claimant had an MRI of the brain, read by Jeffrey Watts, M.D., which showed ". . . numerous abnormal foci of white matter signal in the deep and periventricular white matter tracts, right hemisphere more prominent than left. These are of uncertain etiology. Multiple sclerosis is a possibility if the patient has been previously diagnosed, but this is not usually made as a first diagnosis in the mid 40's. These could be microvascular. Abnormal white matter foci from sheer injury

can occur in trauma, although this would not be the typical pattern." [R. 19-20, R. 398].

- On May 11, 2011, after Dr. Traub received the brain MRI, he stated, "The possibilities are numerous but a vasculitis or ischemia is likely; and a presentation of multiple sclerosis would also be possible but it is not the typical presentation of multiple sclerosis when looking at white matter. However, I have had patients with MS present with this appearance so I cannot preclude it." Then on May 16, 2011, Dr. Traub informed the claimant that, "[h]er entire presentation is characteristic of multiple sclerosis and it is my opinion today that this is what we are dealing with. I would like to collect more evidence of this." The ALJ pointed out, "Dr. Traub went from possible multiple sclerosis to "it is my opinion this is what we are dealing with," even though the opinion he gave the claimant still had not been confirmed by any other objective testing." [R. 20]. On May 31, 2011, when the claimant returned for follow-up, Dr. Traub noted that a spinal tap showed eleven monocytes which are consistent with a chronic inflammatory process in her brain and stated, "As far as I am concerned this concludes the diagnosis of multiple sclerosis. . . I encouraged her to go to Social Security and put in an application so that we can get Medicare going and get her the best possible care." *Id.*

- On August 29, 2011, Allan S. Fielding, M.D., evaluated claimant's back pain. The physical examination showed she stands and walks with a normal gait; her back is tender in the right paralumbar region and over the right buttock; straight leg raising was negative; motor testing revealed full strength; sensory testing revealed no dermatomal sensory loss; she had forward flexion to 60 degrees and extension to 10 degrees caused low back; pulses were intact; deep tendon reflexes were 2+ at the knees and ankles. Dr. Fielding reviewed the lumbar MRI from August 2, 2010; his impression was that claimant "has a traumatic central protrusion at L5-S1 as a result of this accident and is experiencing discogenic pain." Dr. Fielding stated, "She should be treated conservatively for now. Surgery should be a last resort consideration only." [R. 20, R. 425].

- On September 27, 2011, Liggins was seen by David Cohen, M.D., with a presumed diagnosis of multiple sclerosis and lumbar disc disease. Dr. Cohen's assessment was that her MRI was equivocal for multiple sclerosis. He was concerned about the tingling, numbness and loss of balance, but did not confirm the diagnosis of multiple sclerosis. With respect to the back, his impression was that claimant had lumbar disc disease. Physical examination showed she maintained range of motion. There was slight tenderness of the lumbar spine on movement. [R. 20, R. 405 (Ex. 6F)].

- On October 14, 2011, Michael F. Perll, M.D., at the State Disability Determination Division determined the claimant had the residual functional capacity to perform light work. She should avoid climbing ladders, ropes and scaffolds. She can climb ramps and stairs, balance, stop, kneel, crouch and crawl only occasionally. She should avoid hazards such as machinery and heights. [R. 20-21, R. 412-417 (Ex.

   7F). His findings were affirmed by Luther Woodcock, M.D., of the State Disability Determination Division on January 23, 2012. [R. 21, R. 423 (Ex. 9F)].

- On January 11, 2013, at the request of the ALJ, Shashi Husain, M.D., performed a consultative neurological examination of Liggins. The examination showed five out of five strength in all extremities, with normal tone and no evidence of atrophy. Sensation was intact to pinprick, position, sense, light touch vibratory and thermal sensations. Deep tendon reflexes showed all 2+ and equal. Toes were downgoing bilaterally. She had normal finger-to-nose and rapid alternating movements bilaterally. Her gait was normal; claimant was able to walk on toes and on heels. She could do tandem walking. Range of motion of the entire spine was normal. Dr. Husain opined that "the abnormality on the MRI of the brain. . . is secondary to small-vessel disease, which is not unusual with history of headaches" and "[a]t this time, I do not think that this patient has multiple sclerosis." A repeat MRI of the brain for comparison in six months was recommended. The doctor also performed an EEG which was abnormal due to the presence of excessive beta wave activity which was due to medications. Findings were rather nonspecific. [R. 21, R. 446-451 (Ex. 12F)].

- Ronald Devere, M.D., testified via telephone as an impartial medical expert at the July 2, 2013, hearing. He opined that the claimant had many symptoms, but no diagnosis for a severe impairment. He noted the MRI of claimant's back showed protrusion at L5-S1, but this is not a diagnosis because there are no other clinical findings. She had no sensory loss, normal strength and normal reflexes. She has had many symptoms since 2007 but no real diagnosis, and she had not had a real thorough neurological exam until January 2013 when she was examined by Dr. Husain. Dr. Devere opined that, due to her many symptoms, she would be able to perform sedentary work on a daily basis. [R. 22, R. 59-92].

- The ALJ observed that every neurological exam except Dr. Traub's, whose specialty is internal medicine, had been normal; Dr. Traub's diagnosis was based solely on subjective complaints and the MRI, which was equivocal as expressed by Dr. Husain and Dr. Devere; and to the extent that Dr. Traub in his report indicated the MRI results can be consistent with multiple sclerosis, they can also be consistent with other diagnoses. Additionally, Dr. Traub's own initial views also indicated the MRI was equivocal at best. [R. 22].

- Dr. Traub informed claimant that he wanted to send her MRI to a neuroradiologist for a second opinion. The neuroradiologist was Dr. Traub's father, who would not submit a written report. Claimant's counsel argued it was a common practice to conduct an oral consultation by telephone, but the ALJ stated that "as this is considered a second opinion. . . there needs to be an accompanying report from the doctor making the second opinion;" otherwise, the second opinion is considered to be nothing more than hearsay and cannot be given any weight. [R. 22-23].

- The ALJ rejected claimant's arguments that Dr. Devere's comments did not reflect a thorough review of the records; that his remarks were inflammatory toward claimant and her treating physician, Dr. Traub; that he claimed one-time examining doctors should routinely be given weight over that of treating doctors; that this position tainted his view of Dr. Traub's findings;  and that he'd proclaimed treating doctors are needlessly sympathetic and biased in their recommendations. [R. 23].[3] The ALJ stated that Dr. Devere "simply noted the lack of neurological testing and lack of diagnosis made by Dr. Traub." The ALJ concluded that "Dr. Devere noted that because Dr. Husain has never examined the claimant he was able to perform a fresh and thorough exam." [R. 23].

- Dr. Devere had testified that, even if claimant had multiple sclerosis "she still doesn't fit a listing of her facilities . . . Two neurologists have determined that she has a normal neurologic exam, it doesn't matter what the diagnosis is . . . [the issue is] what she is able to do and what's her problem . . .  We're not disputing she doesn't have pain, but there's no diagnosis. . . she's had very good exams and very thorough work-ups." [R. 23].

When faced with conflicting medical evidence, "[t]he trier of fact has the duty to resolve that conflict." *Richardson v. Perales*, 402 U.S. 389, 399 (1971).  Here, the ALJ did just that.  In doing so, he fulfilled his obligation to explain the weight he assigned to each opinion. *See Vigil*, 805 F.3d at 1202.

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  We may not displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

---

[3] Dr. Devere had testified that the report by Dr. Husain showed a normal neurologic exam, the report was thorough and Dr. Husain appeared not to be biased.  [R. 69].  When claimant's counsel asked Dr. Devere whether the other records indicate that the other doctors are biased, he responded, "No, no, I'm just saying because he [] only saw her the one time as opposed to somebody who sees the same person all the time . . . .they do the same thing.  If their exam showed something, you know, six months ago, we all have the tendency to put it in the same record because of the electronic records.  But here's a brand new fresh exam nobody's . . . seen before and a thorough one.  The others were not as thorough as the neurologic exam." [R. 23, R. 70].

Liggins' argument that the ALJ should have given more weight to Dr.Traub's opinion is essentially a request that this court re-evaluate the evidence, emphasizing the evidence that supports her disability claim and discounting the evidence that does not. The court cannot, however, reweigh the evidence. *Newbold v. Colvin*, 718 F.3d 1257, 1265 (10th Cir. 2013). While Liggins' case might be susceptible to conclusions that differ from those made by the ALJ, it is not the court's role to make findings in the first instance. 42 U.S.C. § 405(g) ("The findings of the Commissioner of the Social Security as to any fact, if supported by substantial evidence, shall be conclusive."); *Allen v. Barnhart*, 357 F.3d 1140, 1143-45 (10th Cir. 2004) (court acts within confines of its administrative authority).

## Conclusion

For the reasons set forth above, the Commissioner's decision is hereby **AFFIRMED.**

Entered this 7th day of September, 2016.

_____
Paul J. Cleary
United States Magistrate Judge